# In the United States Court of Federal Claims
## OFFICE OF SPECIAL MASTERS
No. 24-1043V

| | |
|---|---|
| LINDA COPELAND,<br><br>                Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND HUMAN SERVICES,<br><br>                Respondent. | Chief Special Master Corcoran<br><br>Filed: August 25, 2025 |

*Jimmy A. Zgheib, Zgheib Sayad, P.C., White Plains, NY,* for Petitioner.

*Tyler King, U.S. Department of Justice, Washington, DC,* for Respondent.

### RULING ON ENTITLEMENT AND DECISION AWARDING DAMAGES[1]

On July 10, 2024, Linda Copeland filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleged that as a result of an influenza ("flu") vaccine she received on December 5, 2023, she suffered a right shoulder injury related to vaccine administration ("SIRVA") as defined by the Vaccine Injury Table (the "Table"). Petition (ECF No. 1) at Preamble. The case was assigned to the Special Processing Unit ("SPU") of the Office of Special Masters.

For the reasons discussed below, I find it most likely that Petitioner received the flu vaccine in her right shoulder and that she suffered the onset of her shoulder pain

---

[1] Because this unpublished ruling contains a reasoned explanation for the action in this case, I am required to post it on the United States Court of Federal Claims' website in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services). **This means the Ruling will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

specifically within 48 hours of vaccination. Therefore, Petitioner is to compensation. I also find that Petitioner should be awarded $75,000.00 for her actual pain and suffering, and $305.00 for her unreimbursable medical expenses, for a **total of $75,305.00**.

I. **Procedural History**

This claim was initiated on July 10, 2024, and relevant medical records were filed thereafter. ECF No. 1-7, 13, 12. Although the parties attempted to informally resolve this case, they were unable to do so. ECF No. 21. On April 7, 2025, I issued a Scheduling Order setting a schedule for the parties to brief the issues of entitlement and damages. ECF No. 22. The parties have now filed their respective briefs, and this case is ready for adjudication. Petitioner's Motion for Ruling on the Record and Brief in Support of Damages("Mot."), ECF No. 24; Respondent's Rule 4(c) Report and Response ("Opp."), ECF No. 26; Petitioner's Reply ("Reply"), ECF No. 28.

II. **Medical History**

On December 5, 2023, Ms. Copeland, 64-years-old, received a flu vaccine at her primary care provider's ("PCP") office, Advantage Care Physicians, located in Jamaica, New York. Exhibit ("Ex.") 2 at 10. Although Ms. Copeland alleges that she received the flu vaccine in her right shoulder, the vaccination record states that the vaccine was administered in her left shoulder. Ex. 2 at 10. Several years prior to vaccination, Petitioner had a right shoulder issue and was told she had a problem with her rotator cuff, which eventually improved. Ex. 5 at 2-3. There are no other documented histories of any shoulder pain or injury. Ex. 4 at 60-66.

On December 6, 2023 (one day after vaccination), Ms. Copeland was examined by her thoracic surgeon, Snita Sihag, M.D., for treatment of her lung cancer. Ex. 5 at 427. There is no indication that Ms. Copeland complained of shoulder pain in the notes from this visit. *Id*. at 427-433.

In her affidavit, Ms. Copeland states that she "began having right shoulder pain immediately after receiving the flu shot on December 5, 2023. The pain worsened over the following days and weeks, and I had limited mobility in my right shoulder and difficulty with daily activities such as reaching overhead and laying on my right side. I was hopeful that the symptoms would resolve on their own, so I rested my right arm and modified my activities to avoid aggravating the pain." Ex. 3 at 1-2.

On January 4, 2024 (now 30 days post-vaccination), Ms. Copeland was examined by internist Serge Alerte, M.D., for a complaint of right shoulder pain. Ex. 4 at 11-17. Petitioner listed her pain as ongoing for the last four weeks. *Id*. at 12. The physical exam

was positive for arthralgias and myalgias of the musculoskeletal system. *Id*. at 12. Petitioner was prescribed Myalgia-diclofenac gel, imaging was ordered, and Ms. Copeland was advised to follow-up. *Id*. at 17.

On January 18, 2024, Ms. Copeland underwent an MRI of her right shoulder. Ex. 7 at 16-17. The findings of the MRI included: "Subentheseal microtrabecular stress fracture at the posterolateral humeral head, deep to the infraspinatus footprint. 2. Supraspinatus and infraspinatus tendinitis. 3. Low-grade partial-thickness bursal surface tear involving the entire distal infraspinatus footprint. 4. Low-grade interstitial tear at the inferior subscapularis. 5. Mild rotator cuff muscle atrophy. 6. Mild biceps tenosynovitis. 7. Buford complex. Diffuse labral degeneration. 8. Moderate glenohumeral joint effusion with synovitis. 9. Mild to moderate acromioclavicular joint arthropathy. 10. Moderate subacromial-subdeltoid bursitis. 11. Findings suspicious for adhesive capsulitis for which clinical correlation is suggested." *Id*. at 17.

On January 22, 2024, Ms. Copeland sent the following portal message to Dr. Sihag, which was subsequently replied to by registered nurse, Catherine Wickersham:

> I took a flu shot on 12/5/23 as per my primary care physician's instructions. I informed the nurse I had a lobectomy 10/22. I told her it was my upper right lobe. The nurse administered the shot my right shoulder. I am now experiencing lots pain weakness and other discomforts. This has been since the injection. The pain has gotten worse. Do you think the lobectomy on the right side has anything to do with it? Please advise. My primary care doctor is aware and telling me the pain will go away.

Ex. 5 at 1501.

On January 24, 2024 (now 50 days post vaccination), Ms. Copeland was examined by orthopedist Abhishek Ganta, M.D., for complaints of right shoulder pain. Ex. 8 at 2-3. She reported that "she received a flu shot in her right shoulder, which was painful. Since the flu shot, she has developed increasing pain in her right shoulder." Ex. 8 at 2. A physical examination revealed decreased ROM, pain with cross-arm adduction, and positive impingement signs, although there was no strength deficit noted in either arm. *Id*. at 2-3. X-ray images taken in the office were unremarkable. *Id.* at 5. Dr. Ganta's assessment was that Ms. Copeland's exam and history were consistent with right shoulder rotator cuff ("RTC") tendinitis/bursitis after flu vaccination. *Id*. Petitioner was given a steroid injection in her right shoulder and a referral for physical therapy ("PT"). *Id*.

3

Ms. Copeland began PT for her right shoulder on February 1, 2024. Ex. 12. The record notes that the "mechanism of injury was secondary to a flu shot that she received in her right arm." *Id.* at 14. During her initial evaluation she reported impairments in lifting, reaching, sleeping, and daily function, and on exam she had markedly decreased active and passive ROM, strength, and flexibility, contributing to substantial (80%) functional impairments. *Id.* at 14-17. She attended 30 PT sessions through July 10, 2024. Ex. 9 at 2-93; Ex. 12 at 2-68. Petitioner's initial PT evaluation noted she had signs and symptoms consistent with a diagnosis of right shoulder RTC tendonitis. Ex. 9 at 2-7.

On February 28, 2024, Ms. Copeland was examined by orthopedist Julian Sonnenfeld, M.D., for a second opinion. Ex. 10 at 20-24. Petitioner reported "RIGHT shoulder pain since 12/05/23 after receiving flu vaccine" and worsening pain and stiffness. *Id.* at 20. A physical exam revealed restricted ROM, weakness, positive Hawkins and O'Brien impingement tests, and tenderness over the AC joint and bicipital groove. *Id*. X-ray imaging showed mild AC joint degeneration and subacromial spurring. Dr. Sonnenfeld's assessment was "[a]dhesive capsulitis and impingement syndrome of right shoulder, biceps tendinitis," and he prescribed Petitioner a Medrol Dosepak. *Id*.

On April 24, 2024, nearly five months post-vaccination, Ms. Copeland returned to Dr. Ganta with ongoing complaints of right shoulder pain. Ex. 8 at 10-12. On exam, she had limited range of motion—forward elevation to 140°, external rotation to 40°, and internal rotation to L5—with mild pain on cross-arm adduction and positive impingement signs. *Id*. at 11-12. Dr. Ganta confirmed that Petitioner's presentation was consistent with rotator cuff tendinitis and bursitis following flu vaccination. *Id*. He administered a second cortisone injection and recommended continued physical therapy. *Id*.

On July 10, 2024, Ms. Copeland was discharged from PT. Ex. 12 at 10-12. She was noted as having pain in her right shoulder but rating it a 2/10 at best and a 5/10 at worst, with only 10% of her activity being limited by pain. *Id*. The following note was also contained in Petitioner's records regarding her discharge:

> Patient had an appointment today at 3pm and was very rude over the phone when we called her to see if she was coming for her visit, i'm very confused on this situation because is between her and the therapist but she stated her doctor advised her she needed to stop therapy and her last day was supposed to be 6/28, patient requested Richard lenz (PT) to write her a discharged letter, she ended up seeing another therapist and she gave her the letter, the patient then booked 2 more appointments so i don't understand why she was being rude and screaming at me over the phone when she was done with PT i will just d/c the patient because as she

4

stated per the therapist 'she had met her goals'.

Ex. 12 at 10-12.

On September 11, 2024 - nine months post-vaccination - Ms. Copeland returned to Dr. Ganta reporting only temporary relief from her last cortisone injection. Ex. 13 at 3-4. She reported increased anterior shoulder pain localized to the biceps tendon. *Id*. Examination revealed persistent ROM restrictions, pain with cross-arm adduction and positive impingement, Speed, and Yergason tests. *Id*. Dr. Ganta diagnosed biceps tendinitis right biceps tendinitis and discussed treatment options including an ultrasound-guided injection and a repeat MRI if her pain persisted. *Id*. Ms. Copeland declined a steroid injection and was advised to follow up if the pain persisted. *Id*.

Ms. Copeland complained of ongoing right shoulder pain during routine visits with her PCP in November and December. Ex. 21 at 64, 110. She was referred back to her orthopedist on December 17, 2024. *Id*. at 71.

On January 8, 2025, Ms. Copeland returned to Dr. Ganta with complaints of worsening right shoulder pain despite conservative treatment, including PT, multiple cortisone injections (most recently in April 2024), rest, ice, and medication—all without lasting relief. Ex. 15 at 4-6. A physical exam revealed restricted ROM, mild crepitus, pain with cross-arm adduction, reduced supraspinatus strength, and positive impingement, Speed, and Yergason tests. *Id*. X-rays showed no fracture or dislocation. *Id*. Dr. Ganta ordered a repeat MRI for further evaluation. *Id*.

On January 19, 2025, a repeat MRI of Ms. Copeland's right shoulder revealed mild superior cuff tendinosis with a partial-thickness articular surface tear, subcortical cystic changes at the infraspinatus insertion, subacromial/subdeltoid bursitis, small joint effusion, mild chondral thinning, an inferior glenoid spur, and mild thickening of the inferior glenohumeral capsular ligament consistent with ongoing adhesive capsulitis. Ex. 16 at 5-6.

On January 23, 2025, Ms. Copeland saw orthopedic surgeon Dr. Garret Garofolo-Gonzalez for a third opinion in relation to her right shoulder pain. Ex. 19 at 67-68. She reported intermittent, achy pain rated up to 7 out of 10, worsened with activity and partially relieved by rest, Tylenol, and prior cortisone injections. *Id*. She also reported "some tingling and burning pain." *Id*. A physical exam showed limited ROM with positive impingement testing. *Id*. Dr. Garofolo-Gonzalez diagnosed adhesive capsulitis based on MRI findings of partial-thickness infraspinatus tearing, rotator cuff tendinosis, joint effusion, and capsular thickening. *Id*. He also recommended continued PT, a home exercise program, and an intra-articular cortisone injection, which Ms. Copeland elected

to receive. *Id*. Dr. Garofolo-Gonzalez recommended another injection if symptoms persist after three months, and a possible capsular release after nine months. *Id*. Given her hypothyroidism, which may delay recovery, coordination with her endocrinologist was advised. *Id*.

Ms. Copeland resumed PT for her right shoulder on February 3, 2025, and she attended 19 additional sessions through April 2, 2025. Ex. 17. She reported persistent, sharp and aching pain rated between 6 and 6 out of 10, aggravated by reaching, lifting, sleeping, and performing household tasks. *Id*. A physical examination of her right shoulder revealed severely restricted ROM, weakness, and tenderness. *Id*. She was instructed on a home exercise program. *Id.*

On May 2, 2025, Ms. Copeland returned to Dr. Garofolo-Gonzalez for a follow up of her right shoulder. Ex. 25 at 21-23. Petitioner reported that she had returned to PT twice a week, had been using a Lidocaine patch and was taking Tylenol for pain. *Id*. at 21. She reported less pain in her right shoulder as a result. *Id*. On examination, impingement testing was negative although there was a slight limitation in range of motion of the right shoulder. *Id*. at 22. Ms. Copeland was assessed with adhesive capsulitis of the right shoulder. *Id*. Dr. Garofolo-Gonzalez advised Ms. Copeland that frozen shoulder is often associated with diabetes mellitus and thyroid disorders. *Id*. It was agreed that Ms. Copeland should continue with conservative treatment for the next three months, and then if there was no improvement, another steroid injection would be considered. *Id*.

On June 10, 2025, Ms. Copeland returned to Dr. Garofolo-Gonzalez in follow up reporting "some mild improvement with pain since last visit…" Ex. 25 at 17. Petitioner reported that she had not returned to formal physical therapy but had instead been doing a home exercise program. *Id*. She also stated that she was continuing to use Lidocaine patches. *Id*. On examination, Petitioner had positive Job testing (an impingement test) and mild deficits in her range of motion of the right shoulder. *Id*. at 18. Dr. Garofolo-Gonzalez reviewed the result of a recent MRI of Ms. Copeland's right shoulder and assessed her with biceps tendinitis of the right upper extremity, adhesive capsulitis of the right shoulder, and impingement syndrome of the right shoulder. *Id*. Ms. Copeland decided to continue with conservative treatment and physical therapy was again prescribed. *Id*. She received another steroid injection at this visit. *Id*. at 19. Ms. Copeland was instructed to follow up in another six to eight weeks. *Id*.

In her most recent affidavit dated April 29, 2025, Ms. Copeland states that she still continues to experience sharp and aching pain, weakens, and stiffness if her right shoulder. Ex. 22 at 1. She states that she still has difficulty with daily activities and continues to experience ongoing "psychological fear when using my right arm, worried

that overuse would aggravate the pain or cause additional or permanent damage. This fear has created a mental block that limits my ability to engage confidently normal activities." *Id*. at 1-2. Ms. Copeland states that "[t]his injury has caused me not only physical pain but also significant emotional distress and loss of independence, both of which have impacted my quality of life." *Id*. at 2.

### III. Parties' Arguments

#### a. Petitioner

Petitioner contends that the medical records support her claim that she suffered a SIRVA injury following receipt of the flu vaccine on December 5, 2023. Ms. Copeland argues that she received the flu vaccine in her dominant right shoulder and that the injection site listed in the vaccination record – left arm – is a clerical error and not reliable. Mot. at 11. Regarding onset, Petitioner states that her medical records consistently document her right shoulder pain as beginning "since" or "after" the vaccine, and that several records explicitly identify December 5, 2023, as the date of onset. Mot. at 10. Thus, Petitioner argues that she has demonstrated a Table SIRVA claim and is entitled to compensation. Mot. at 13.

#### b. Respondent

Respondent argues that the contemporaneous medical records do not demonstrate that Ms. Copeland has satisfied her burden to establish a Table SIRVA. Opp. at 5. As an initial matter, Respondent states that Petitioner has claimed a right-sided SIRVA, "but the vaccination record plainly indicates that the flu vaccine was administered in petitioner's left deltoid." Mot. at 6. Thus, Respondent contends that for that reason alone, Petitioner's claim fails. *Id*. Respondent also contends that there is not preponderant evidence to establish that the onset of Petitioner's right shoulder pain began within 48 hours after vaccination. *Id*. at 5-7. Respondent argued complaints of shoulder pain do not appear in the contemporaneous medical records until January 4, 2024, 30 days post-vaccination. *Id*. at 6. In addition, Respondent argues that when Ms. Copeland saw a medical provider one day post vaccination, she was "noted as having normal ROM, and there was no complaint of pain [in] the upper extremity." *Id*. at 6-7.

### IV. Applicable Law

Pursuant to Vaccine Act Section 13(a)(1)(A), a petitioner must prove, by a preponderance of the evidence, the matters required in the petition by Vaccine Act Section 11(c)(1). A special master must consider, but is not bound by, any diagnosis, conclusion, judgment, test result, report, or summary concerning the nature, causation, and aggravation of petitioner's injury or illness that is contained in a medical record.

Section 13(b)(1). "Medical records, in general, warrant consideration as trustworthy evidence. The records contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions. With proper treatment hanging in the balance, accuracy has an extra premium. These records are also generally contemporaneous to the medical events." *Cucuras v. Sec'y of Health & Hum. Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993).

Accordingly, where medical records are clear, consistent, and complete, they should be afforded substantial weight. *Lowrie v. Sec'y of Health & Hum. Servs.*, No. 03-1585V, 2005 WL 6117475, at *20 (Fed. Cl. Spec. Mstr. Dec. 12, 2005). However, this rule does not always apply. "Written records which are, themselves, inconsistent, should be accorded less deference than those which are internally consistent." *Murphy v. Sec'y of Health & Hum. Servs.*, No. 90-882V, 1991 WL 74931, *4 (Fed. Cl. Spec. Mstr. April 25, 1991), quoted with approval in decision denying review, 23 Cl. Ct. 726, 733 (1991), *aff'd per curiam*, 968 F.2d 1226 (Fed.Cir.1992)). And the Federal Circuit recently "reject[ed] as incorrect the presumption that medical records are accurate and complete as to all the patient's physical conditions." *Kirby v. Sec'y of Health & Hum. Servs.*, 997 F.3d 1378, 1383 (Fed. Cir. 2021).

The United States Court of Federal Claims has outlined four possible explanations for inconsistencies between contemporaneously created medical records and later testimony: (1) a person's failure to recount to the medical professional everything that happened during the relevant time period; (2) the medical professional's failure to document everything reported to her or him; (3) a person's faulty recollection of the events when presenting testimony; or (4) a person's purposeful recounting of symptoms that did not exist. *La Londe v. Sec'y of Health & Hum. Servs.*, 110 Fed. Cl. 184, 203-04 (2013), *aff'd*, 746 F.3d 1335 (Fed. Cir. 2014).

The Court has also said that medical records may be outweighed by testimony that is given later in time that is "consistent, clear, cogent, and compelling." *Camery v. Sec'y of Health & Hum. Servs.*, 42 Fed. Cl. 381, 391 (1998) (citing *Blutstein v. Sec'y of Health & Hum. Servs.*, No. 90-2808, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998). The credibility of the individual offering such fact testimony must also be determined. *Andreu v. Sec'y of Health & Hum. Servs.*, 569 F.3d 1367, 1379 (Fed. Cir. 2009); *Bradley v. Sec'y of Health & Hum. Servs.*, 991 F.2d 1570, 1575 (Fed. Cir. 1993).

A special master may find that the first symptom or manifestation of onset of an injury occurred "within the time period described in the Vaccine Injury Table even though the occurrence of such symptom or manifestation was not recorded or was incorrectly recorded as having occurred outside such period." Section 13(b)(2). "Such a finding may

be made only upon demonstration by a preponderance of the evidence that the onset [of the injury] . . . did in fact occur within the time period described in the Vaccine Injury Table." *Id*.

The special master is obligated to fully consider and compare the medical records, testimony, and all other "relevant and reliable evidence contained in the record." *La Londe*, 110 Fed. Cl. at 204 (citing Section 12(d)(3); Vaccine Rule 8); *see also Burns v. Sec'y of Health & Hum. Servs.*, 3 F.3d 415, 417 (Fed. Cir. 1993) (holding that it is within the special master's discretion to determine whether to afford greater weight to medical records or to other evidence, such as oral testimony surrounding the events in question that was given at a later date, provided that such determination is rational).

## V.  Analysis

### Fact Findings – Situs, Onset and Entitlement

Pursuant to Vaccine Act Section 13(a)(1)(A), a petitioner must prove, by a preponderance of the evidence, the matters required in the petition by Vaccine Act Section 11(c)(1). In addition to requirements concerning the vaccination received, the duration and severity of petitioner's injury, and the lack of other award or settlement,[3] a petitioner must establish that she suffered an injury meeting the Table criteria, in which case causation is presumed, or an injury shown to be caused-in-fact by the vaccination she received. Section 11(c)(1)(C).

The most recent version of the Table, which can be found at 42 C.F.R. § 100.3, identifies the vaccines covered under the Program, the corresponding injuries, and the time period in which the particular injuries must occur after vaccination. Section 14(a). Pursuant to the Vaccine Injury Table, a SIRVA is compensable if it manifests within 48 hours of the administration of an influenza vaccine. 42 C.F.R. § 100.3(a)(XIV)(B). A vaccine recipient shall be considered to have suffered SIRVA if such recipient manifests all of the following:

> (i) No history of pain, inflammation or dysfunction of the affected shoulder prior to intramuscular vaccine administration that would explain the alleged signs, symptoms, examination findings, and/or diagnostic studies occurring after vaccine injection;

---

[3] In summary, a petitioner must establish that she received a vaccine covered by the Program, administered either in the United States and its territories or in another geographical area but qualifying for a limited exception; suffered the residual effects of her injury for more than six months, died from her injury, or underwent a surgical intervention during an inpatient hospitalization; and has not filed a civil suit or collected an award or settlement for her injury.  *See* § 11(c)(1)(A)(B)(D)(E).

(ii) Pain occurs within the specified time frame;

(iii) Pain and reduced range of motion are limited to the shoulder in which the intramuscular vaccine was administered; and

(iv) No other condition or abnormality is present that would explain the patient's symptoms (*e.g.* NCS/EMG or clinical evidence of radiculopathy, brachial neuritis, mononeuropathies, or any other neuropathy).

42 C.F.R. § 100.3(c)(10).

A special master must consider, but is not bound by, any diagnosis, conclusion, judgment, test result, report, or summary concerning the nature, causation, and aggravation of petitioner's injury or illness that is contained in a medical record. Section 13(b)(1). "Medical records, in general, warrant consideration as trustworthy evidence. The records contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions. With proper treatment hanging in the balance, accuracy has an extra premium. These records are also generally contemporaneous to the medical events." *Cucuras v. Sec'y of Health & Hum. Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993).

Accordingly, where medical records are clear, consistent, and complete, they should be afforded substantial weight. *Lowrie v. Sec'y of Health & Hum. Servs.*, No. 03-1585V, 2005 WL 6117475, at *20 (Fed. Cl. Spec. Mstr. Dec. 12, 2005). However, the Federal Circuit has recently "reject[ed] as incorrect the presumption that medical records are always accurate and complete as to all of the patient's physical conditions." *Kirby v. Sec'y of Health & Hum. Servs.*, 997 F.3d 1378, 1383 (Fed. Cir. 2021). Medical professionals may not "accurately record everything" that they observe or may "record only a fraction of all that occurs." *Id.*

Medical records may be outweighed by testimony that is given later in time that is "consistent, clear, cogent, and compelling." *Camery v. Sec'y of Health & Hum. Servs.*, 42 Fed. Cl. 381 at 391 (1998) (citing *Blutstein v. Sec'y of Health & Hum. Servs.*, No. 90-2808, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998). The credibility of the individual offering such testimony must also be determined. *Andreu v. Sec'y of Health & Hum. Servs.*, 569 F.3d 1367, 1379 (Fed. Cir. 2009); *Bradley v. Sec'y of Health & Hum. Servs.*, 991 F.2d 1570, 1575 (Fed. Cir. 1993).

A special master may find that the first symptom or manifestation of onset of an injury occurred "within the time period described in the Vaccine Injury Table even though the occurrence of such symptom or manifestation was not recorded or was incorrectly recorded as having occurred outside such period." Section 13(b)(2). "Such a finding may be made only upon demonstration by a preponderance of the evidence that the onset [of the injury] . . . did in fact occur within the time period described in the Vaccine Injury Table." *Id*.

The special master is obligated to fully consider and compare the medical records, testimony, and all other "relevant and reliable evidence contained in the record." *La Londe Sec'y of Health & Hum. Servs.*, 110 Fed. Cl. 184 at 204 (2013) (citing § 12(d)(3); Vaccine Rule 8); *see also Burns v. Sec'y of Health & Hum. Servs.*, 3 F.3d 415, 417 (Fed. Cir. 1993) (holding that it is within the special master's discretion to determine whether to afford greater weight to medical records or to other evidence, such as oral testimony surrounding the events in question that was given at a later date, provided that such determination is rational).

### A. Table SIRVA Elements

Respondent has only contested the onset requirement in Ms. Evans's case. After a review of the entire record, and as set forth below, I find that a preponderance of the evidence demonstrates that Petitioner has satisfied the Qualifications and Aids to Interpretation ("QAI") requirements for a Table SIRVA.

*Situs*

Although the vaccination administration record (Ex. 2 at 10) states that Petitioner received the flu vaccine in her left deltoid, Petitioner *reported* right shoulder pain a mere four weeks (30 days) after vaccination, specifically stating that she received the vaccination in her right shoulder. Ex. 4 at 12 (Petitioner presents "with pain for almost 4 weeks post vaccination to the rt shoulder.") In every record thereafter, Petitioner consistently reported right shoulder pain associated with the vaccination. She also received all treatment to her right shoulder, including two MRIs, the first which showed adhesive capsulitis, rotator cuff tendinitis, subacromial-subdeltoid bursitis, synovitis, partial thickness rotator cuff tears (Ex. 7 at 139-40), and all of Petitioner's medical providers evaluated and diagnosed right shoulder symptoms. *See* e.g., Ex. 8 at 3 (orthopedic surgeon diagnosed "right shoulder cuff tendinitis/bursitis after flu shot.").

In addition, all of Petitioner's physical therapy was conducted on her right deltoid. *See* Ex. 12; *see also* Ex. 17. She also received three cortisone injections to her right

shoulder. Ex. 8 at 2-3; Ex. 25 at 19. There is no other record evidence (other than the record of vaccination) to the contrary. Thus, the record as it stands preponderates in favor of the determination that Petitioner received the flu vaccine in her right shoulder, as alleged.

*Pain Occurs with the Specified Timeframe (Onset)*

In order to meet the definition of a Table SIRVA, a petitioner must show that she experienced the onset of pain within 48 hours of vaccination (42 C.F.R. § 100.3(a)(XIV)(B)) and § 100.3(c)(10)(ii) (QAI criteria)).

Respondent's onset argument rests on the fact that Ms. Copeland did not complain of right shoulder pain until January 4, 2024, 30 days post vaccination. Opp. at 6. In addition, Petitioner had a medical exam one day post vaccination, on December 6, 2024, where it was supposedly noted that Petitioner had normal ROM and there was no complaint of pain in the upper extremity. *Id*. at 6-7.

These arguments lack sufficient preponderant record support. Ms. Copeland was seen by her PCP just 30 days post-vaccination, a very reasonable amount of time for her to determine whether her shoulder pain would dissipate or was something more serious. Ex. 4 at 12. During this visit, her PCP specifically noted that Ms. Copeland was experiencing right shoulder pain "for almost 4 weeks post vaccination to the r[igh]t shoulder." *Id*.

There are other notations throughout the record where Ms. Copeland identifies the onset for her right shoulder pain. *See,* e.g., January 4, 2024: "Pain for almost 4 weeks post vaccination to the rt shoulder." Ex. 5 at 1501, dated January 22, 2024, "I took a flu shot on 12/5/2023… The nurse administered the shot in my right shoulder. I am now experiencing lots of pain, weakness and other discomforts. This has been since the injection. The pain has gotten worse."); Ex. 8 at 2, dated January 24, 2024 ("About a month ago she received a flu shot in her right shoulder, which was painful. Since the flu shot, she has developed increasing pain in her right shoulder.") Ex. 10 at 20, dated February 28, 2024: "RIGHT shoulder pain since 12/05/23 after receiving flu vaccine." Ex. 19 at 67, dated January 23, 2025, ("Evaluation of RIGHT shoulder pain since 12/05/23 after receiving flu vaccine." Ex. 17 at 2-3, dated February 3, 2025, ("Reported mechanism of injury was secondary to a flu shot that she received in her right arm" and "Date of onset: 12-05-23.") All of these notations and circumstances lend support to Petitioner's argument that her shoulder pain likely began within 48 hours of vaccination.

12

Respondent also questions why Petitioner did not complain of shoulder pain at her oncology visit one day post vaccination. Opp. at 6-7. However, as I have stated before, a routine oncology visit is not an obvious occasion to request treatment for an unrelated issue, such as shoulder pain, especially just one day post-vaccination. Thus, I find that Ms. Copeland has preponderantly met the 48-hour onset requirement.

### B. Other Requirements for Entitlement

In addition to establishing a Table injury, a petitioner must also provide preponderant evidence of the additional requirements of Section 11(c). The overall record contains preponderant evidence to fulfill these additional requirements.

The record shows that Petitioner received a flu vaccine intramuscularly on December 5, 2023. Ex. 2 at 10; *see* Section 11(c)(1)(A) (requiring receipt of a covered vaccine); Section 11(c)(1)(B)(i)(I) (requiring administration within the United States or its territories). There is no evidence that Petitioner has collected a civil award for her injury. Petition at 3; Section 11(c)(1)(E) (lack of prior civil award). I have also found that Petitioner received the flu vaccine to her right shoulder, and that the onset of Petitioner's right shoulder pain occurred within 48 hours of vaccination. *See* 42 C.F.R. § 100.3(c)(10)(ii) (setting forth this requirement). This finding satisfies the requirement that Petitioner's first symptom or manifestation of onset occur within the time frame listed on the Vaccine Injury Table. 42 C.F.R. § 100.3(a)(XIV)(B) (listing a time frame of 48 hours for a Table SIRVA following receipt of the influenza vaccine). Therefore, Petitioner has satisfied all requirements for a Table SIRVA.

The last criteria which must be satisfied by Petitioner involves the duration of her SIRVA. For compensation to be awarded, the Vaccine Act requires that a petitioner suffer the residual effects of his or her left shoulder injury for more than six months or required surgical intervention. *See* Section 11(c)(1)(D)(i) (statutory six-month requirement). Starting from December 6, 2023 (24 hours after vaccination), the records undoubtedly demonstrate that Petitioner suffered the residual effects of her shoulder injury for more than six months. *See*, *e.g.*, Ex. 19 at 67-68 (records documenting Petitioner's receipt of a steroid injection in her right shoulder on January 23, 2025). Thus, this requirement is also met.

Based upon all of the above, Petitioner has established that she suffered a Table SIRVA. Additionally, she has satisfied all other requirements for compensation. I therefore find that Petitioner is entitled to compensation in this case.

**VI.     Damages**

    **I.     Legal Standard**

Compensation awarded pursuant to the Vaccine Act shall include an award "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000." Section 15(a)(4). Additionally, a petitioner may recover "actual unreimbursable expenses incurred before the date of judgment award such expenses which (i) resulted from the vaccine-related injury for which petitioner seeks compensation, (ii) were incurred by or on behalf of the person who suffered such injury, and (iii) were for diagnosis, medical or other remedial care, rehabilitation . . . determined to be reasonably necessary." Section 15(a)(1)(B). Petitioner bears the burden of proof with respect to each element of compensation requested. *Brewer v. Sec'y of Health & Human Servs.*, No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996).

There is no precise formula for assigning a monetary value to a person's pain and suffering and emotional distress. *I.D. v. Sec'y of Health & Human Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) ("Awards for emotional distress are inherently subjective and cannot be determined by using a mathematical formula"); *Stansfield v. Sec'y of Health & Human Servs.*, No. 93-0172V, 1996 WL 300594, at *3 (Fed. Cl. Spec. Mstr. May 22, 1996) ("the assessment of pain and suffering is inherently a subjective evaluation"). Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering. *I.D.*, 2013 WL 2448125, at *9 (quoting *McAllister v. Sec'y of Health & Human Servs.,* No 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)).

A special master may also look to prior pain and suffering awards to aid in the resolution of the appropriate amount of compensation for pain and suffering in each case. *See, e.g.*, *Doe 34 v. Sec'y of Health & Human Servs.*, 87 Fed. Cl. 758, 768 (2009) (finding that "there is nothing improper in the chief special master's decision to refer to damages for pain and suffering awarded in other cases as an aid in determining the proper amount of damages in this case."). And, of course, a special master may rely on his or her own experience adjudicating similar claims. *Hodges v. Sec'y of Health & Human Servs.*, 9 F.3d 958, 961 (Fed. Cir. 1993) (noting that Congress contemplated the special masters would use their accumulated expertise in the field of vaccine injuries to judge the merits of individual claims). Importantly, however, it must also be stressed that pain and suffering is not determined based on a continuum. *See Graves v. Sec'y of Health & Human Servs.*, 109 Fed. Cl. 579 (2013).

## II.    Parties' Arguments

### a. Petitioner

Ms. Copeland has requested $100,000.00 in pain and suffering. In support, she cites to four cases involving comparable awards: (1) *Young v. Sec'y of Health & Human Servs.*, No. 15-1241V, 2019 WL 396981 (Fed. Cl. Spec. Mstr. Jan. 4, 2019), (2) *Bruegging v. Sec'y of Health & Human Servs.*, No. 17-0261V, 2019 WL 2620957 (Fed. Cl. Spec. Mstr. May 13, 2019), (3) *T.S. v. Sec'y of Health & Human Servs.*, No. 21-0441V, 2024 WL 540042 (Fed. Cl. Spec. Mstr. Nov. 19, 2024), and (4) *Acetta v. Sec'y of Health & Human Servs.*, No. 1-1731V, 2021 WL 1718202 (Fed. Cl. Spec. Mstr. Mar. 31, 2021). Ms. Copeland states that she continues to have pain and discomfort in her right shoulder on a daily basis. Ex. 22 at 1.

### b. Respondent

Respondent argues that Petitioner suffered a mild-to-moderate SIRVA injury and should receive a pain and suffering award consistent with cases with similar injuries. In that respect, Respondent proposes the amount of $65,000.00 as appropriate. Opp. at 8-10, 14.

Respondent's position is based in part on the contention that Ms. Copeland delayed seeking medical treatment by not reporting right shoulder pain until 30 days later, on January 4, 2024. Opp. at 10. In addition, Petitioner began formal PT and was subsequently discharged by July 10, 2024. *Id*. By September 11, 2024, Petitioner's physical exams did not record any strength deficits. *Id.* Respondent also noted that Petitioner's treatment included 49 PT sessions, three steroid injections, and two MRIs, over a duration of 17 months. Additionally, Ms. Copeland never underwent arthroscopic surgery for the treatment of her shoulder pain. *Id*. Thus, Respondent argues that these factors are consistent with the majority of mild-to-moderate SIRVA injuries in the Vaccine Program, and the amount of damages awarded should be commensurate with such.

Respondent distinguishes the cases cited by Petitioner in support of her damages demand, citing to three cases in support of his proposed figure of $65,000.00. (1) *Allner v. Sec'y of Health & Human Servs.*, No. 19-1048V, 2022 WL 962656 (Fed. Cl. Spec. Mstr. Sept. 9, 2022), (2) *Klausen v. Sec'y of Health & Human Servs.*, No. 19-1977V, 2023 WL 2368823 (Fed. Cl. Spec. Mstr. Feb. 2, 2023), and (3) *Murray v. Sec'y of Health & Human Servs.*, No. 18-0534V, 2020 WL 4522483 (Fed. Cl. Spec. Mstr. July 6, 2020).

### III.     Appropriate Compensation in this SIRVA Case

### a. Pain and Suffering

In this case, awareness of the injury is not disputed. The record reflects that at all times Ms. Copeland was a competent adult with no impairments that would impact her awareness of her injury. Therefore, I analyze principally the severity and duration of her injury. When performing this analysis, I review the same record relied upon to determine entitlement, including the filed affidavits and medical records, and written briefs. I have also considered prior awards for pain and suffering in both SPU and non-SPU SIRVA cases and rely upon my experience adjudicating these cases.

Ms. Copeland suffered a mild-to-moderate SIRVA injury which did not necessitate surgery. Her treatment course was conservative and limited. Her right shoulder symptoms were managed mostly with PT sessions and steroid injections. Her actual treatment course lasted approximately 17 months.

Petitioner cites to the *Young* and *Bruegging* cases, both of which were decided before initiation of the "Motions Day" process – intended in part to formalize damages awards in SIRVA and other Table cases. Since then, there have been more than 200 reasoned SIRVA damages decisions that I have issued, creating a body of case law for SIRVA injuries that allow the parties to informally resolve cases involving similar facts. While the two cases cited by Petitioner are not without guidance value, the more recently issued reasoned decisions have trended toward a slightly lower amount awarded for pain and suffering as the understanding of the SIRVA injuries have grown over time depending upon the particular facts of each case.

In the *Acetta* case, No. 17-1731V, 2021 WL 1718202 (Fed. Cl. Spec. Mstr. Mar. 31, 2021), a petitioner was awarded $95,000.000 in past pain and suffering for a moderate-to-severe SIRVA injury. The *Acetta* petitioner underwent treatment for five years, including two MRIs, nine PT sessions, an extensive home exercise plan, and had debilitating ongoing sequelae. *Id.* at *5. Moreover, imaging of the *Acetta* petitioner's shoulder showed "continued partial thickness tearing of the supraspinatus and mild bursitis in the subacromial/subdeltoid bursa." *Id.* at *4. In the instant case, by contrast, Ms. Copeland treated her injury for 17 months and at no point had debilitating sequelae. Thus, the differences between *Acetta* and the instant case demonstrate that a lower amount for pain and suffering is merited here.

In the *T.S.* case, No. 21-0441V, 2024 WL 5400462 (Fed. Cl. Nov. 19, 2024)), it was found that a petitioner suffered a moderate severe SIRVA injury for three years. *Id*.

at *7. However, the petitioner eventually had to resign from her job in light of difficulties with her ongoing shoulder injury. *Id*. The T.S. petitioner's treatment consisted of primary care and orthopedic visits, imaging, 16PT sessions, prescription pain medication, and 2 steroid injections. *Id*. Importantly, her treating orthopedic surgeon recommended surgical intervention fairly early into her treatment course. Id. Because the petitioner's former employer refused to cover the cost of surgery and additional medical treatment, the petitioner was unable to undergo surgery. *Id*. Compared to the present matter, Ms. Copeland has undergone treatment for a little over half the time as the petitioner in *T.S*, and her injury was not so severe that surgical intervention was advised.

Respondent, on the other hand, cites to three cases to support his proposed award of $60,000.00. But many of those petitioners had a substantial delay in seeking treatment, which is not the case with Ms. Copeland. Ms. Copeland reported her injury fairly quickly, just 30 days post vaccination, and she was seen by her PCP for treatment of her right shoulder pain. Of the remaining case without a significant delay in initial reporting, the most comparable case is *Murray*. While no single case will ever have the exact same set of facts as another case, these two cases appear to be the most useful.

In *Murray,* the petitioner also suffered a mild-to-moderate SIRVA injury, that did not necessitate surgery, with a primary treatment period of approximately 12 months. *Murray*, 2020 WL 4522483 (Fed. Cl. Spec. Mstr. July 6, 2020). Ms. Murray nevertheless endured multiple rounds of PT sessions, as well as 22 chiropractic treatments, an MRI, and three cortisone injections. Ms. Murray also maintained that her injury interfered with both her daily life and enjoyment of other activities such as her equestrian pursuits. And the *Murray* petitioner was also offered a steroid injection which she declined, and possible surgery was considered, she also attended far less physical therapy, 11 sessions, than Ms. Evans, suggesting a mild-to-moderate injury. Ms. Murray was awarded $,65,000.00 in pain and suffering. However, given that Ms. Copeland attended much more physical therapy and had a slightly longer treatment period, an award slightly more than Ms. Murray was given is warranted in this case.

Under such circumstances, and considering the arguments presented by both parties, a review of the cited cases, and based on the record as a whole, I find that **$75,000.00** in compensation for Ms. Copeland's past pain and suffering is reasonable and appropriate in this case.

### b. Unreimbursable Expenses

In his brief, Respondent did not object to the $215.00 Petitioner claimed for out-of-pocket unreimburseable expenses. During the hearing, Petitioner stated that she had

three additional PT sessions amounting to an additional $90.00, as substantiated by Ex. 25 at pages 25-27. Respondent stated that there was no objection to this additional amount. Thus, I award Petitioner a total of $305.00 for her unreimbursable expenses.

## CONCLUSION

Based on my consideration of the complete record as a whole and for the reasons discussed above, pursuant to Section 12(d)(3)(A), **I find that $75,000.00 represents a fair and appropriate amount of compensation for Petitioner's actual pain and suffering.[4] She is also awarded a total of $305.00 for her unreimbursable medical expenses. Accordingly, I award Petitioner a lump sum payment of $75,305.00, to be paid through an ACH deposit to Petitioner's counsel's IOLTA account for prompt disbursement to Petitioner**. This amount represents compensation for all damages that would be available under Section 15(a). The Clerk of Court is directed to enter judgment in accordance with this Decision.[5]

**IT IS SO ORDERED.**

**s/Brian H. Corcoran**
Brian H. Corcoran
Chief Special Master

---

[4] Since this amount is being awarded for actual, rather than projected, pain and suffering, no reduction to net present value is required. *See* Section 15(f)(4)(A); *Childers v. Sec'y of Health & Hum. Servs.*, No. 96-0194V, 1999 WL 159844, at *1 (Fed. Cl. Spec. Mstr. Mar. 5, 1999) (citing *Youngblood v. Sec'y of Health & Hum. Servs.*, 32 F.3d 552 (Fed. Cir. 1994)).

[5] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.